# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

**KAREN C.,[1]**

        Plaintiff,               Civ. No. 1:22-cv-00362-AA

    v.                     **OPINION & ORDER**

**COMMISSIONER OF SOCIAL SECURITY**,

        Defendant.

_____

AIKEN, District Judge:

Plaintiff Karen C. seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying benefits. The decision of the Commissioner is AFFIRMED and this case is DISMISSED.

## BACKGROUND

On May 14, 2018, Plaintiff filed a Title II application for a period of disability and disability insurance benefits alleging disability beginning on January 1, 2018. Tr. 13.  The applications were denied initially and upon reconsideration and, at Plaintiff's request, a telephonic hearing was held before an Administrative Law Judge ("ALJ") on February 12, 2021.  *Id.*  On March 3, 2021, the ALJ issued a

---

[1] In the interest of privacy, this opinion uses only first name and the initial of the last name of the non-governmental party or parties in this case.  Where applicable, this opinion uses the same designation for a non-governmental party's immediate family member.

decision finding Plaintiff not disabled.  Tr. 24.  On January 20, 2022, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1.  This appeal followed.

## DISABILITY ANALYSIS

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r*, 648 F.3d 721, 724 (9th Cir. 2011).

> The five-steps are: (1) Is the claimant presently working in a substantially gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments described in the regulations? (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Id.* at 724-25; *see also Bustamante v. Massanari,* 262 F.3d 949, 954 (9th Cir. 2001).

The claimant bears the burden of proof at steps one through four. *Bustamante*, 262 F.3d at 953. The Commissioner bears the burden of proof at step five. *Id.* at 953-54. At step five, the Commissioner must show that the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v);

416.920(a)(4)(v).  If, however, the Commissioner proves that the claimant is able to perform other work existing in significant numbers in the national economy, the claimant is not disabled. *Bustamante*, 262 F.3d at 953-54.

## THE ALJ'S FINDINGS

The ALJ performed the sequential analysis.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of January 1, 2018.  Tr. 15.

At step two, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease; and right shoulder impingement/degenerative joint disease.  Tr. 16.  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  Tr. 17.

The ALJ found Plaintiff had the residual functional capacity ("RFC") to perform light work with the following additional limitations: she can occasionally climb ramps, stairs, ladders, ropes, and scaffolds; she can frequently stoop, kneel, and crouch; she can occasionally crawl; she can occasionally reach overhead bilaterally; she can frequently, but not constantly, handle, finger, and feel bilaterally; and she cannot perform tasks that require frequent neck movement.  Tr. 18.

At step four, the ALJ found Plaintiff was able to perform her past relevant work as an administrative clerk and hotel clerk.  Tr. 23.  As a result, the ALJ found that Plaintiff was not disabled.  Tr. 23-24.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if the decision is based on proper legal standards and the legal findings are supported by substantial evidence in the record. *Batson v. Comm'r*, 359 F.3d 1190, 1193 (9th Cir. 2004). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation and internal quotation marks omitted). In reviewing the Commissioner's alleged errors, this Court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusion." *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986).

When the evidence before the ALJ is subject to more than one rational interpretation, courts must defer to the ALJ's conclusion. *Batson*, 359 F.3d at 1198 (citing *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995)). A reviewing court, however, cannot affirm the Commissioner's decision on a ground that the agency did not invoke in making its decision. *Stout v. Comm'r*, 454 F.3d 1050, 1054 (9th Cir. 2006). Finally, a court may not reverse an ALJ's decision on account of an error that is harmless. *Id.* at 1055–56. "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

## DISCUSSION

Plaintiff alleges the ALJ erred by (1) improperly discounting Plaintiff's subjective symptom testimony; and (2) improperly discounting medical opinion evidence.

### I.    Subjective Symptom Testimony

Plaintiff asserts that the ALJ erred by discounting her subjective symptom testimony.  To determine whether a claimant's testimony is credible, an ALJ must perform a two-stage analysis.  20 C.F.R. § 416.929.  The first stage is a threshold test in which the claimant must produce objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  At the second stage of the credibility analysis, absent evidence of malingering, the ALJ must provide clear and convincing reasons for discounting the claimant's testimony regarding the severity of symptoms.  *Id.*

The ALJ must make findings that are sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony. *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014).  "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Id.* (internal quotation marks and citation omitted).  An ALJ may use "ordinary techniques of credibility evaluation" in assessing a claimant's testimony, such as prior inconsistent statements concerning the symptoms, testimony that appears less than candid, unexplained failure to seek

treatment or follow a prescribed course of treatment, or a claimant's daily activities. *Id.*

In this case, Plaintiff testified at the hearing that, following a battle with cervical cancer, she suffers from urinary incontinence and needs to go to the bathroom every thirty minutes.  Tr. 49-50.

Plaintiff suffers from neck pain, which persists despite two fusion surgeries. Tr. 50-51.  Plaintiff rated her neck pain as a six out of ten and testified that she gets feelings of numbness and tingling from her neck radiating into her arms.  Tr. 51. Plaintiff testified that she also has a limited range of motion in her neck and would be unable to work at a job that required her to move her neck.  Tr. 51-52.  Plaintiff testified that he has a limited ability to grip, grasp, or handle since her fusion surgery and would not be able to perform work that required that type of manipulation.  Tr. 52-53.

Plaintiff also testified that she suffers from hip pain, which causes shooting pain down her legs and constant throbbing.  Tr. 53.  Plaintiff estimated that, as a result of her hip pain, she could sit for twenty minutes before needing to get up and move.  *Id.*  Plaintiff testified that she could walk "probably a block" and could stand in place for between five and ten minutes.  Tr. 54.  Plaintiff would find climbing stairs "very difficult" and would be unable to work at a job where she had to climb stairs. *Id.*  Plaintiff testified that she uses a "couch recliner" to relieve her pain, but that she can only sit in it for twenty minutes before needing to change position.  Tr. 57. Plaintiff does not use any assistive device for mobility.  Tr. 59-60.  Plaintiff testified

that, even if she had an employer that would allow her to change positions at will, she did not believe that she would be able to sustain work for more than "maybe four" hours. Tr. 54. Plaintiff estimated that she would miss two days of work in a five-day work week. Tr. 57.

Plaintiff also testified concerning shoulder impairments. Tr. 56. Plaintiff reported that her right should has "some kind of tendon strain in it" which makes lifting her arm "very, very painful" and that it "just hurts all day." *Id.* Plaintiff rated her should pain as a six or seven out of ten. Tr. 56-57. Plaintiff testified that she would find it difficult to work in a job where she would need to have her hands in front of her or above her head. Tr. 56.

Plaintiff takes hydrocodone, duloxetine, baclofen, Xanax, and trazadone, as well as over the counter painkillers to treat her condition. Tr. 58. Plaintiff testified that the medication causes dizziness, blurred vision, nausea, and fatigue. *Id.* Plaintiff testified that the side effects of her medication make it difficult for her to maintain attention or concentration, even in two-hour increments. *Id.*

Plaintiff testified that she lives in a travel trailer with her husband and two small dogs. Tr. 42. Plaintiff seldom drives, although no medical providers have advised against driving. *Id.* Plaintiff testified that she struggles with shopping because of the lifting involved and that "cooking is very minimal in our home right now." Tr. 55-56. In 2019, Plaintiff earned some money watching her autistic grandson as "relief care" for her daughter. Tr. 48.

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Tr. 19.

In considering Plaintiff's testimony, the ALJ assessed the objective medical evidence. "Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis." *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005). However, a conflict between a claimant's testimony and the objective medical evidence is a proper basis for discounting subjective symptom testimony. *Morgan v. Comm'r*, 169 F.3d 595, 600 (9th Cir. 1999); *Bray v. Comm'r*, 554 F.3d 1219, 1227 (9th Cir. 2009).

Here, as noted, Plaintiff testified that she suffers from urinary incontinence and needs to use the restroom every thirty minutes as a result of a previous treatment for cervical cancer. However, in December 2019 Plaintiff was seen for a surgical consult, in which she expressly denied urinary urgency or incontinence. Tr. 713. The ALJ's consideration of this contradiction, Tr. 20, is a valid basis for discounting Plaintiff's subjective testimony.

With respect to Plaintiff's back and neck impairments, the ALJ noted that in January 2020, Plaintiff was assessed for what the medical records describe as "elective" spine surgery. Tr. 20, 323. During that assessment, Plaintiff was found to have a normal range of motion in both of her shoulders, elbows, and wrists without

pain, crepitation, or instability.  Tr. 324.  For Plaintiff's spine, ribs, and pelvis, the physician noted "Normal posture, no deformity of ribs or spine, level pelvis, non-tender to palpitation over spine and SI joints, normal flexion, extension, rotation, and lateral bending without pain, crepitation or instability," and "[n]ormal muscular tone."  *Id.*  Plaintiff's neck had "good motion but some reproduction of her pain at extremes."  *Id.*  Plaintiff had negative straight leg raise tests bilaterally and normal or near-normal strength in all tested joints.  Tr. 325.  Plaintiff had a "nonfocal neurological exam" in February 2020 following surgery.  Tr. 727.  A CT of Plaintiff's spine in July 2020 revealed "trace" anterolisthesis on C4 and C5; "borderline" spinal canal stenosis at C6 and C7, and "Mild bilateral neural foraminal stenosis at C5-C6." Tr. 733.  In August 2020, Plaintiff underwent a posterior cervical fusion at C5-C7. Tr. 762-63.  Plaintiff was x-rayed in November 2020, where it was determined that that the hardware installed was "intact and stable in position," and that the anterolisthesis of C33 was "unchanged," with "mild to moderate facet arthritis" seen at C2-C3, C3-C4, and C4-C5, as well as "[m]ild degenerative changes" seen at articulation of C1 on C2."  Tr. 882.  In a post-operation exam, Plaintiff's neurological examination was "nonfocal."  Tr. 884.  The ALJ appropriately considered these relatively mild objective medical findings in assessing Plaintiff's subjective symptom testimony.  Tr. 20-21.

The ALJ also considered Plaintiff's post-onset work activity.  "An ALJ may consider any work activity, including part-time work, in determining whether a claimant is disabled."  *Ford v. Saul*, 950 F.3d 1141, 1156 (9th Cir. 2020).  Here, the

ALJ noted that Plaintiff's alleged onset was January 1, 2018 and that Plaintiff earned $9,998 in 2018, "which is generally consistent with her yearly earnings during 2013, 2014, and 2016." Tr. 15. Although the ALJ concluded that Plaintiff's earnings did not constitute substantial gainful activity because it was unlikely that Plaintiff earned the entire sum in a single month, "the consistency between the claimant's 2013, 2014, 2016, and 2018 earnings undermines [t]he allegation of disability." *Id.* The ALJ also noted that Plaintiff earned $4,155 in 2019 by working as a caregiver for her grandchildren. Tr. 20. This is a valid consideration for the ALJ to include in the disability analysis and the ALJ's consideration of Plaintiff's post-onset work is supported by substantial evidence.

The ALJ also considered Plaintiff's activities of daily living. Tr. 17, 20. As noted, a claimant's daily activities are a valid consideration in assessing subjective symptom testimony. *Ghanim*, 763 F.3d at 1163. Plaintiff's function report showed that she was able to independently care for herself, perform household chores, prepare meals, drive, go shopping, and manage her own finances. Tr. 238-45. As previously discussed, Plaintiff also did paid work as a caregiver for her grandchildren. Tr. 20. The ALJ reasonably considered this level of activity as inconsistent with the degree of limitation alleged by Plaintiff.

On this record, the Court concludes that the ALJ did not err in discounting Plaintiff's subjective symptom testimony.

## II.    Medical Opinion Evidence

Plaintiff asserts that the ALJ erred in discounting the medical opinion of Erik Olsson, M.D.  The Ninth Circuit has clarified that under the new regulations, "the former hierarchy of medical opinions—in which we assign presumptive weight based on the extent of the doctor's relationship—no longer applies." *Woods v. Kijakazi*, 32 F.4th 785, 787.  Now, an ALJ's "decision to discredit any medical opinion, must simply be supported by substantial evidence." *Id.*  "The most important factors that the agency considers when evaluating the persuasiveness of medical opinions are *supportability* and *consistency*." *Id.* at 791 (emphasis added, internal quotation marks and citations omitted).  For supportability, the regulations provide that the "more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  As for consistency: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).

Here, Dr. Olsson completed a medical source statement in December 2020.  Tr. 885-889.  In his statement, Dr. Olsson diagnosed Plaintiff with cervical radiculopathy and pseudoarthirtis and listed her prognosis as stable.  Tr. 885.  Dr. Olsson reported that his diagnosis was supported by Plaintiff's tenderness, muscle spasms, sensory

changes, reduced grip strength, and her dropping things. *Id.* Dr. Olsson reported that Plaintiff had significant limitations of motion, with 60% flexion and extension, and 80% rotation and lateral bending in both her left and right extremities. *Id.*

Dr. Olsson checked "yes" when asked if Plaintiff suffered from severe headache pain, but when asked for details he either left the form blank, wrote "unknown" or "not a headache doctor/neurologist" in the sections of the form where he was invited to explain his answer. Tr. 886. Dr. Olsson left other sections of the form blank as well, including sections asking about the side effects of medication; whether emotional factors contributed to Plaintiff's limitations; any psychological conditions affecting Plaintiff; how often Plaintiff is likely to be "off task" and how her limitations would interfere with her attention and concentration; how well Plaintiff tolerates stress; and how often Plaintiff would likely be absent from work. Tr. 886-87, 889.

Dr. Olsson wrote "unknown" when asked how many blocks Plaintiff could walk without rest or severe pain. Tr. 887. He estimated that Plaintiff could sit for one hour before needing to get up and could stand for one hour before needing to sit or walk around. *Id.* Dr. Olsson reported that Plaintiff could sit for approximately two hours in an eight-hour workday and could stand or walk for the same amount of time. *Id.* He reported that Plaintiff would require a position that allowed her to shift positions at will and walk around during her workday. *Id.* She would need to walk for five minutes every ninety minutes and would also require two unscheduled breaks lasting twenty minutes during her day. *Id.* Dr. Olsson reported that Plaintiff could frequently lift up to ten pounds, rarely lift twenty pounds, and never lift fifty pounds.

Tr. 888.  She could occasionally look up and down, turn her head, and hold her head in a static position.  *Id.*  She could occasionally twist, stoop, crouch, or climb ladders and stairs.  *Id.*  Dr. Olsson checked "yes" when asked if Plaintiff had significant limitations with reaching, handling, or fingering, but when asked to give specifics he left the section blank other than writing "unknown."  *Id.*  Dr. Olsson also checked "yes" when asked if Plaintiff would have good days and bad days but, as noted, left blank the section on how many days she was likely to be absent from work as a result of her impairments.  Tr. 889.

The ALJ found that Dr. Olsson's opinion was not supported by his own treatment notes.  Tr. 21-22 (finding that "the notes from Dr. Olsson and others does not describe the claimant as exhibiting deficits in range of motion, strength, sensation, and reflexes in her upper extremities and cervical spine that would support greater limitations than included in the residual functional capacity.").  The ALJ noted that Dr. Olsson provided no explanation for why Plaintiff's neck pain would limit her ability to sit, stand, or walk, nor did he explain why Plaintiff would be limited to two hours of sitting and two hours of standing in an eight-hour day.  Tr. 22-23.  The ALJ also noted that Dr. Olsson entirely failed to answer several sections of the function report.  Tr. 23.

Dr. Olsson's post-operative examination in November 2020 showed that Plaintiff was healing well and her neurological exam was "nonfocal."  Tr. 884.  An examination of Plaintiff by Dr. Olsson in July 2020 showed normal gait; normal range of motion without pain in all four extremities; normal posture; and normal muscle

tone.  Tr. 730.  Dr. Olsson found 5/5 strength in all but one of the metrics, noting 4/5 strength in intrinsics, and the straight leg raise test was negative on both sides.  Tr. 730-31.  A contradiction between a physician's opinion and his treatment notes has been recognized as a clear and convincing reason for discounting that physician's opinion.  *Ford v. Saul*, 950 F.3d at 1154.

The ALJ also found that the limitations assessed by Dr. Olsson were not consistent with the other medical opinions and evidence in the record.  An examination by Dr. Sandesh Pandit in June 2019 showed normal sensation and "5/5" muscle strength and no obvious deformity, but with some restriction to her range of motion due to pain and guarding.  Tr. 847-48.  In September 2019, Dr. Pandit reviewed the results of an MRI on Plaintiff's cervical spine and found generally "mild spinal stenosis."  Tr. 839.

On this record, the Court concludes that the ALJ appropriately considered all the necessary factors, including supportability and consistency, and that the ALJ's decision to discount Dr. Olsson's opinion is supported by substantial evidence in the record.  The ALJ did not err in discounting Dr. Olsson's opinion.

## CONCLUSION

Pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is AFFIRMED and this case is DISMISSED.

It is so ORDERED and DATED this ____7th____ day of November 2023.


 /s/Ann Aiken
ANN AIKEN
United States District Judge